UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

  v.           Case No. 20-CR-185

GER YANG,

    Defendant.

## PLEA AGREEMENT

  1.  The United States of America, by its attorneys, Richard G. Frohling, Acting United States Attorney for the Eastern District of Wisconsin, and Gail J. Hoffman and Elizabeth M. Monfils, Assistant United States Attorneys, and the defendant, Ger Yang, individually and by attorney Thomas E. Harris, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

  2.  The defendant has been charged in one count of a fifteen-count indictment, which alleges violations of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), (b)(1)(B), (b)(1)(C), and 846; and Title 18, United States Code, Section 2.

  3.  The defendant has read and fully understands the charge contained in the indictment. He fully understands the nature and elements of the crime with

which he has been charged, and the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant voluntarily agrees to plead guilty to the following count set forth in full as follows:

<u>COUNT ONE</u>

THE GRAND JURY CHARGES THAT:

1.     Beginning by at least January 2017, and continuing until on or about September 22, 2020, in the State and Eastern District of Wisconsin and elsewhere,

LOUIS REY PEREZ, III,
a/k/a "Ocho," a/k/a "Eight Ball,"
XINA YANG,
JULIAN SANCHEZ,
a/k/a "Terps,"
MIGUEL SARABIA,
a/k/a "Ali Mas," a/k/a "Ali Massari,"
GABRIEL MATTESON,
LOUIS REY PEREZ, JR.,
a/k/a "Pops,"
MANUEL SOTO,
a/k/a "Roach," a/k/a "Grillo,"
ANTONIO RODRIGUEZ,
a/k/a "Lil Mexico," a/k/a "Grumpy," a/k/a "Bump,"
HAUSENG YANG,
HECTOR ARENAS,
LUIS F. GOMEZ, JR.,
a/k/a "Scarecrow,"
IVAN J. GALAN,
a/k/a "Porky,"
JOSE A. ALVARADO,
a/k/a "Jokes,"
ESTEBAN REYES,
KEVIN TAYLOR,
a/k/a "Eskimo,"
MA YANG,
MARY YANG,
JASMINE L. PEREZ,
MICHAEL BUB,
a/k/a "Buddy,"

2

CHONG YANG,
a/k/a "Chongy,"
MICHELE M. HART,
MERCEDES HERBERT GONZALEZ,
AZIA YANG,
CARINA RODRIGUEZ,
GER YANG, and
SHAYLA A. KNUEPPEL

knowingly and intentionally conspired with each other, and with other persons known and unknown to the grand jury, to possess with the intent to distribute and to distribute a mixture and substance containing a detectable amount of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

2.      With respect to defendants LOUIS REY PEREZ, III, a/k/a "Ocho," a/k/a "Eight Ball," and XINA YANG, the amount involved in the conspiracy attributable to each defendant as a result of his and her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him and her, is five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

3.      With respect to defendants JULIAN SANCHEZ, a/k/a "Terps," MIGUEL SARABIA, a/k/a "Ali Mas," a/k/a "Ali Massari," LOUIS REY PEREZ, JR., a/k/a "Pops," MANUEL SOTO, a/k/a "Roach," a/k/a "Grillo," and ANTONIO RODRIGUEZ, a/k/a "Lil Mexico," a/k/a "Grumpy," a/k/a "Bump," the amount involved in the conspiracy attributable to each defendant as a result of his or her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him or her, is 1,000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

4.      With respect to defendants GABRIEL MATTESON, HAUSENG YANG, HECTOR ARENAS, LUIS F. GOMEZ, JR., a/k/a "Scarecrow," IVAN J. GALAN, a/k/a "Porky," JOSE ALVARADO, a/k/a "Jokes," ESTEBAN REYES, KEVIN TAYLOR, a/k/a "Eskimo," MA YANG, MARY YANG, JASMINE L. PEREZ, MICHAEL BUB, a/k/a "Buddy," CHONG YANG, a/k/a "Chongy," MERCEDES HERBERT GONZALEZ, AZIA YANG, CARINA RODRIGUEZ, GER YANG, and SHAYLA A. KNUEPPEL, the amount involved in the conspiracy attributable to each defendant as a result of his or her own conduct, and the conduct of other co-conspirators reasonably foreseeable to him or her, is 100 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

5.      With respect to defendant MICHELE M. HART, the amount involved in the conspiracy attributable to her as a result of her own conduct, and the conduct

3

of other co-conspirators reasonably foreseeable to her, is 50 kilograms or more of a mixture and substance containing a detectable amount of marijuana, a Schedule I controlled substance.

All in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A), (b)(1)(B), and (b)(1)(C), and Title 18, United States Code, Section 2.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense described in paragraph 4. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the following facts beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilt beyond a reasonable doubt:

### Summary of Investigation

In September 2018, law enforcement authorities identified Louis R. Perez III (a/k/a "Ocho," and a/k/a "Eight Ball"), also identified as a Mexican Posse gang member, as the individual spearheading a drug-trafficking organization (DTO) that was distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere since at least January 2017. Law enforcement authorities also identified Xina Yang, Perez III's then girlfriend, as someone who worked hand-in-hand with Perez III to further the DTO. The DTO obtained cocaine and marijuana from California, either through couriers or through United Parcel Service (UPS) and FedEx. Perez III and Yang coordinated the package retrieval from various Milwaukee, Wisconsin residences, oversaw a marijuana vape cartridge manufacturing operation located at a codefendant's residence, distributed marijuana and marijuana-related products under the name brand "Midwest Connect" or "Midwest Connected," and mailed drug proceeds to the California-based supplier.

Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian Sanchez and/or Miguel Sarabia, Sanchez's father, who resided in California, supplied the Perez III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, and marijuana vape cartridges.

During the course of the investigation, Title III orders authorized the interception of communications over seven telephones used by Perez III, Yang, Sanchez, and Sarabia, as well as the Snapchat account "Midwest_connect," used by Perez III. Collectively, these interceptions began on March 20, 2020, and continued through September 22, 2020, with the exception of small periods of time. The intercepted communications confirmed that Perez III obtained marijuana from

4

Sanchez and Sarabia, that Perez III distributed the narcotics to mid-level distributors and suspected street-level users, and that Yang facilitated and coordinated the day-to-day DTO operations.

## DTO's History, Method, and Operation

The investigation revealed that up until late 2019, Perez III and Yang frequently traveled to California on behalf of the DTO, many times staying for significant periods of time in hotels and Airbnb rentals. At this time, Perez III and Yang instructed other DTO members to manage the distribution of controlled substances in Milwaukee when they were in California.

On September 25, 2018, Louis R. Perez Jr., Perez III's father, was stopped in Utah with eight kilograms of cocaine in a trap compartment in his truck. Perez III and Yang drove separately, but traveled along with Perez Jr. from California to Wisconsin, communicating with Perez Jr. on two prepaid telephones activated before their departure from California. After Perez Jr. was stopped, Perez III and Yang also stopped, at which point Yang booked hotel rooms and airfare for herself, Perez III, and Perez Jr. upon his release from custody.

Beginning in November 2019, Perez III and Yang moved back to Milwaukee. At this time, the DTO's mode of operation switched to mailing controlled substances and proceeds between California and Milwaukee. Also at this time, Sanchez obtained hundreds of pounds of marijuana from growers in northern California. Sanchez, along with Gabriel Matteson, packaged and sent the marijuana through FedEx and UPS to numerous addresses in Milwaukee, Wisconsin. Perez III and Yang regularly tracked the controlled substance packages' whereabouts on their phones. They also coordinated the package retrieval from various Milwaukee residences.

Court authorized interceptions, combined with physical surveillance, reflect that the Perez III DTO received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. DTO package recipients included Jose Alvarado, Shayla Knueppel, Mercedes Herbert Gonzalez, Chong Yang, Mary Yang, Ma Yang, and Michael Bub.

On April 29, 2020, law enforcement seized and lawfully searched a DTO package. The package contained approximately 9 pounds of high-grade marijuana and approximately 237 grams of THC oil, which oil was packaged in one-gram quantity plastic containers. Both the THC oil and marijuana were packaged in vacuum sealed bags. Later in the day on April 29, 2020, in accordance with UPS policy, UPS opened another package addressed to Alvarado and Knueppel's address because it smelled of marijuana. The package was found to contain approximately 2,029 grams of THC oil, which was packaged in one-gram quantity plastic

5

containers. Throughout April 29 and 30, 2020, both Perez III and Yang contacted FedEx and UPS numerous times regarding the intercepted packages.

Perez III used couriers, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, and Esteban Reyes to obtain the packages containing controlled substances from various addresses and transport the packages to other DTO locations, including Perez Jr.'s residence, where the packages were stored until manufacture, packaging, and distribution. Hector Arenas maintained at least two stash houses where Perez III and various other DTO members were often seen coming and going around the time of suspected drug transactions. Jasmine Perez, Perez III's sister, served as a DTO nominee, leasing one of the stash apartments that was controlled by Manual Soto.

Additionally, the Perez III DTO manufactured "vape cartridges" containing THC oil at the residence of Mary Yang, Yang's sister. Under the direction of Perez III and Yang, marijuana vape cartridges were assembled by the thousands by DTO members primarily connected to Xina Yang, including Ma Yang, Mary Yang, Chong Yang, Azia Yang, Carina Rodriguez, and Ger Yang. The investigation also revealed that Sanchez and/or Sarabia also imported supplies, to include vape cartridge tubes and boxes, as confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes.

Case agents estimate based on the number of DHL boxes received by the Perez III DTO that the DTO received at least 25,000 vape cartridge boxes and empty marijuana vape pens that were imported from Hong Kong.

Perez III distributed the cocaine, marijuana, and marijuana-related products to mid-level DTO-distributors, including Manuel Soto, Antonio Rodriguez, Hauseng Yang, Hector Arenas, Luis Gomez, Jr., Ivan Galan, Esteban Reyes, Kevin Taylor, and Ger Yang. These mid-level distributors subsequently distributed the controlled substances to numerous customers in the greater Milwaukee, Wisconsin, area, at times using the third-party application Snapchat. The marijuana and marijuana-related products were distributed under the brand name "Midwest Connect" or "Midwest Connected."

Subsequently, the DTO mailed packages containing bulk currency in the form of drug proceeds to Sanchez or enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, Sarabia traveled to Milwaukee, Wisconsin, to obtain drug proceeds from Perez III.

Yang counted and packaged the drug proceeds that were sent to Sanchez via the United States Postal Service (USPS) at three different addresses. Ma Yang, Yang's sister, often assisted. On April 16, 2020, law enforcement searched two parcels that Perez III mailed to Sanchez, pursuant to sneak and peak warrants. The search revealed that each parcel contained $20,000 in U.S. currency hidden in

6

magazines. The money was meticulously taped between the various magazine pages to conceal the parcels' true contents.

Although Perez III and/or Yang used aliases and unrelated addresses to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications confirmed their association with the packages.

Since at least December 11, 2019, Perez III and Yang mailed at least 87 packages, believed to contain bulk U.S. currency, to Sanchez in California, using the United States Postal Service (USPS). Based upon DTO records, the DTO mailed approximately $1.7 million in drug proceeds in a six-month period. In July 2020, Perez III mailed three USPS parcels containing a total of $60,000 to Sanchez. All three parcels were believed to be stolen, prompting the DTO to stop mailing drug proceeds, and instead use couriers to deliver bulk currency to Sanchez.

### Defendant – Ger Yang

Ger Yang (Ger) is the brother of codefendants Xina Yang, Mary Yang, Ma Yang, Chong Yang and Hauseng Yang. The investigation revealed that Ger assisted the DTO with the transportation of packages containing controlled substances, the manufacture of marijuana vape cartridges, and the transportation of drug proceeds to Julian Sanchez for the DTO. During the course of the investigation, incriminating communications were intercepted between Ger Yang and users of Target Telephones.

For example, on May 25, 2020, at 12:29 p.m., Xina Yang, using Target Telephone 4, called Ger Yang, using (414) 416-xxxx. Xina asked, "Where you at? Home?" Ger stated, "Yeah." Xina asked, "Where's [U/I] address? I need to -- I need to get um ... that thing in the garage." Case agents believe that Xina Yang needed to obtain controlled substances from Ger Yang's garage at Ger's residence. Ger stated, "Uh, it's uh, [LOST AUDIO] fifty six (56th) and Florist." Case agents believe that Ger misspoke, and meant to say "65th and Florist" Xina asked, "You're gonna be there, right?" Ger replied, "Well, actually, I'm actually gonna head out right now, but why?" Xina asked, "Is the garage open?" Ger stated, "How long is it gonna be? No, it's not open ... Why would it be open?" Case agents believe Ger had the garage locked and that Xina needed to access the garage to obtain controlled substances. Xina responded, "Exactly -- That's why I need you to be there." At the end of the conversation, Xina stated, "Send me the address." At 12:34 p.m., Xina Yang, using Target Telephone 4, received an incoming text from Ger Yang, using (414) 416-xxxx. Case agents did not intercept this text because the court order did not authorize text messaging during the time this text message was sent.

On May 25, 2020, at 2:07 p.m., Xina Yang, using Target Telephone 4, called Perez III, using Target Telephone 1. Perez III stated, "I'm right here pullin' up

7

dude, I'm coming from the north side. What the fuck!" Xina stated, "She said it's fine, she's just gonna leave." Later in the conversation, Perez III stated, "I know, I'm coming all the way from Florist." Xina replied, "I know that. That's what I was tellin' her. She said that she's just gonna go, she's just gonna pick the bike and drive it back to the [U/I]." Case agents believe that an unknown female was watching Perez III and Xina's child, and Perez III told Xina that he was "coming from the north side," from "Florist." Case agents believe, based on the call with Xina Yang at 12:29 p.m. referenced above, that Perez III was returning home from Ger Yang's residence after obtaining controlled substances from Ger Yang's garage. Location data from Perez III's Target Telephone 1 placed Perez III near the area of N. 76th Street and W. Hampton Avenue at 1:52 p.m.

On June 2, 2020, at 5:07 p.m., Xina Yang, using Target Telephone 4, called Ger Yang, using (414) 416-xxxx. During this call, Xina inquired about Ger's location. Ger stated he was "at the mall." Xina asked, "Oh. You not workin'?" Ger replied, "Shit, no. I mean, if anything, I can, I can head there in a bit. I just have to come and "Xina told Ger that they needed "a pot" from their mother's house. Ger replied, "Oh my god, lord. I can go do that too before I come there then." Xina stated, "We need it right now. We trying to ha--eat before we all [AUDIO BREAKS] fucking work." Based upon the positional data for Target Telephone 4, case agents know that Xina Yang was located in the area of Mary Yang's residence at 47xx N. 49th Street [the location of the marijuana vape cartridge manufacturing site]. Further, that Xina Yang told Ger Yang that everyone was going to eat before they began manufacturing the marijuana vape cartridges.

On June 7, 2020, at 9:44 p.m., Xina Yang called Ger Yang, using (414) 416-xxxx. Xina asked, "Where you at?" Ger replied, "I'm on my way there. I'm basically getting off of Howell right now. I couldn't answer because the fucking police were kinda driving right by me, and you guys kept callin'." Xina laughed and stated, "My bad. Alright, bye." Case agents believe that during this call, Ger was transporting controlled substances for the DTO, and was nervous because the police were in the vicinity.

On June 29, 2020, at 12:01 p.m., Xina Yang, using Target Telephone 4, called Ger Yang, using (414) 416-9423. Xina stated, "I'm calling because Mary [codefendant and sibling] still has at least two (2) of your boxes to do or one and a half (1.5). And you know, it's best for you to come over here, and help him out you know, that --and help her out and do it." Based upon their training, experience and familiarity with the investigation, case agents believe that Xina Yang referred to Perez III when she informed Ger Yang that it was "best for him (GER)," to "help him out." Ger asked, "Wait, what?" Xina repeated, "I'm calling because Mary has a box left to do and she would like for you to help her because it's your stuff." Ger stated, "Oh my. Alright." Xina then told Ger to "hurry up and come over here." Case agents believe that Xina Yang was upset because Ger Yang had not assembled the number of marijuana vape cartridges for which Ger was responsible (i.e., there

8

was at least "a box left" to complete). Based upon their training, experience, and familiarity with the investigation, case agents believe that the term "box" refers to a 100-count quantity of marijuana vape cartridges.

On July 20, 2020, at 8:52 p.m., Xina Yang, using Target Telephone 4, called Ger Yang, using (414) 416-xxxx. Portions of this call were in Hmong and translated by trained DEA linguists. Ger asked, "Hello. Yeah, I was gonna say, where do I come and pick up my money?" Xina stated, "Uh..." Ger continued, "I did, I did six (6) of 'em today." Xina replied, "Alright, um...well, I'm at home but let me call Louis 'cause I don't know where he put the money at." Ger responded, "Okay. Alright, then." Case agents believe that during this call, Ger Yang informed Xina Yang that Ger had completed the assembly of 600 marijuana vape cartridges ("6 of em") and Ger wanted his payment. Before paying Ger, Xina needed to call Perez III ('Louis') to find where Perez III had put the money before Xina could pay Ger.

At 9:58 p.m., Ger Yang, using (414) 416-xxxx, called Xina Yang, using Target Telephone 4. Xina stated, "He supposed to be on his way home. He said just wait." Ger replied, "Alright." Xina continued, "You gotta go up there to Mary's house anyway, so yeah, we'll just give it to you tomorrow." Ger replied, "Alright." Case agents believe that during this call, Xina Yang told Ger Yang that Perez III would pay him tomorrow because Ger had to return to Mary Yang's residence the following day to continue to manufacture marijuana vape cartridges.

On July 22, 2020, at 6:07 p.m., Ger Yang, using (414) 416-xxxx, called Xina Yang, using Target Telephone 4. Xina asked, "You here?" Ger replied, "Yeah." Xina stated, "Alright, what I was gonna say, what did you do? How many you do? Twelve hundred (1,200) only?" Ger answered, "Yeah. I only did twelve hundred (1200)." Xina asked, "Did you package or anything?" Ger replied, "No, I didn't." Xina stated, "Alright. Bye." Case agents believe that during this call, Xina Yang confirmed with Ger Yang that Ger had only completed 1,200 marijuana vape cartridges that day and did not package them up for retail sale.

Additionally, during the course of this investigation case agents examined the pen register data for codefendant and marijuana supplier Julian Sanchez's Target Telephone 5, and observed that between August 7 and August 11, 2020, there were 12 calls and/or text messages between Sanchez and Ger Yang. Case agents had not previously observed Ger Yang and Sanchez communicate on any of the known telephone numbers used by either of them. Based upon their training, experience and familiarity with the investigation, case agents believe that Ger Yang likely brought proceeds from the DTO to personally deliver to Sanchez as payment for controlled substances. At this point in time, case agents are aware that the DTO shifted away from the use of USPS to send DTO proceeds because of the missing $60,000 in U.S. currency described above.

9

To this end, a source of information (SOI #5), recalled that either in August or September of 2020, Ger Yang flew out to California from Milwaukee, Wisconsin. SOI #5 estimated that Ger Yang had between $40,000 to $60,000 in U.S. currency provided to Ger Yang by Perez III concealed in his suitcase. Upon arrival, Yang then handed over the cash to Sanchez.

SOI #5 further indicated that on at least two prior occasions, SOI #5 was aware that Ger Yang assisted in the manufacture of marijuana vape cartridges for the DTO while in California. Specifically, SOI #5 had observed Ger Yang in various Airbnb's located in Coachella and Clear Lake, California, for the primary purpose of participating in the manufacture of vape cartridges.

An additional source of information (SOI #4) indicated that Ger Yang also worked for the DTO to fill marijuana vape cartridge at Mary Yang's house in Milwaukee, Wisconsin.

Based upon the evidence, Ger Yang is responsible for the distribution of at least 100 kilograms, but less than 400 kilograms of a mixture and substance containing marijuana.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6.      The parties understand and agree that the offense to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment, fines, and supervised release:

> COUNT ONE: 40 years and $5,000,000 fine. The Count also carries a mandatory minimum of 5 years of imprisonment, and at least 5 years and a maximum life term of supervised release. The count also carries a mandatory special assessment of $100

7.      The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## PROOF OF DRUG WEIGHT FOR STATUTORY MAXIMUM PENALTY

8.     The parties understand and agree that for the penalties in 21 U.S.C. §841(b)(1)(B) to apply, as provided in paragraph 6 above, the government must prove beyond a reasonable doubt that the offense to which the defendant is pleading guilty involved at least 100 kilograms of marijuana. The defendant agrees that the government possesses sufficient, admissible evidence to meet this burden.

## ELEMENTS

9.     The parties understand and agree that in order to sustain the charge of conspiracy to possess with the intent to distribute or to distribute a controlled substance as set forth in Count One, in violation of 21 U.S.C. §§ 841(a)(1) and 846, the government must prove each of the following propositions beyond a reasonable doubt:

First, the conspiracy, as alleged in the indictment, existed; and

Second, the defendant knowingly and intentionally joined the conspiracy with the intention to further the conspiracy

## SENTENCING PROVISIONS

10.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the

11

court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense set forth in paragraph 4. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

14.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

12

## Relevant Conduct

15.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

16.     The parties agree to recommend to the sentencing court that the relevant conduct attributable to the defendant is at least 100 kilograms but less than 400 kilograms of a mixture and substance containing marijuana, a Schedule I controlled substance.

## Base Offense Level

17.     The parties agree to recommend [to the sentencing court that the applicable base offense level for the offense charged in Count One is 24 under Sentencing Guidelines Manual § 2D1.1(c)(8).

## Safety Valve

18.     The government agrees that if the defendant otherwise qualifies for the limitation on applicability of statutory minimum sentences under 18 U.S.C. § 3553(f), the government will not object to its application and will recommend a sentence consistent with Sentencing Guidelines Manual § 5C1.2.

## Acceptance of Responsibility

19.     The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that

13

the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

20.     Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

21.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

22.     The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the Court.

## Court's Determinations at Sentencing

23.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the

14

sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

24. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

25. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction. The defendant further understands that any payment schedule imposed by the sentencing court shall be the minimum the defendant is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. The defendant agrees not to request any delay or stay in payment of any and all financial obligations. If the defendant is incarcerated, the defendant agrees to participate in the Bureau of Prisons' Inmate Financial Responsibility Program, regardless of whether the court specifically directs participation or imposes a schedule of payments.

26. The defendant agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office, at least 30 days before sentencing, and also upon request of the FLU during any period of probation or supervised release imposed by the court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form.

15

## Special Assessment

27.     The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

## DEFENDANT'S COOPERATION

28.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

## DEFENDANT'S WAIVER OF RIGHTS

29.     In entering this agreement, the defendant acknowledges and understands that he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

16

b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

30. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

17

31.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

32.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

33.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

### GENERAL MATTERS

34.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

18

35.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

36.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

37.     The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

38.     The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for

19

any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

39.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 12/6/2021

GER YANG
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 12/11/21

THOMAS E. HARRIS
Attorney for Defendant

For the United States of America:

Date: 12/13/21

RICHARD G. FROHLING
Acting United States Attorney

Date: 12/13/21

GAIL J. HOFFMAN
ELIZABETH M. MONFILS
Assistant United States Attorneys

21